(92 South. 777)

No. 24406.

McGITTIGAN et ux. v. NEW ORLEANS RY. & LIGHT CO. et al.

(June 5, 1922. Rehearing Denied by Division B July 1, 1922.)

*(Syllabus by Editorial Staff.)*

Street railroads ⊂⟶114(19)—Evidence insufficient to show clear chance of avoiding striking boy.

In an action for the death of a boy, who alighted from a street car and passed behind it and was struck by a car on another track, evidence *held* insufficient to show, by a preponderance thereof, that he was within the line of danger oblivious of his position for a considerable time, and that the car had a clear chance of avoiding the accident.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Action by Harry McGittigan and wife against the New Orleans Railway & Light Company and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

F. B. Davenport, of New Orleans, for appellants.

Dart, Kernan & Dart, of New Orleans, for appellees.

By Division A, composed of Chief Justice PROVOSTY and Justices OVERTON and LECHE.

PROVOSTY, C. J. The little son of plaintiffs, 12 years old, was killed by a downtown car of the defendant company on Camp street—a double track street—at the inter-section of Gaiennie street, just after he had gotten off an uptown car on the parallel track alongside. He had been selling newspapers, and was returning home, riding free on the car, newsboy fashion. It was after dark; but there was a street electric light at the street intersection.

After two jury mistrials, the case was submitted to the judge for decision, as is required by law. He dismissed the suit.

A newsboy testified:

"Me and Tommy got on at St. Joseph street and we rode to Gaiennie and the conductor told me and Tom to get off, and so I asked him to let us ride another block, and he said, "No." So he took his cap and threw it over into the street and then we got off to hunt for it, and I stayed on this side, and he went to hunt for his cap. He asked where his cap was, and I told him it was down on the other side of the track, and he kept going and, when he found the cap, stooped over, and the car knocked him down."

This boy testified further that the boy walked some 20 feet down between the two tracks; and that the part of the car which struck him was the fender, not the step. He was positive as to this.

An invalided soldier testified:

"* * * I was going up home through Margaret place, and a Coliseum car going uptown, about 15 feet this side of Gaiennie street the conductor throws one of two boys' cap out of the back vestibule. This lad jumps off the car and goes hunting for his cap. I kept on walking towards Gaiennie street. When I got to Gaiennie street the car going uptown had stopped to let two passengers off. I waited there. I seen the lad that the cap was thrown off the car walking towards Gaiennie street looking for his cap. A downbound Coliseum car, while the boy was facing Canal street in a kind of stooping position, like he was trying to find his cap, the front left step of the downtown car hits the boy and knocks him from his feet, and as he does his head kind of falls towards the front box of the downtown car. * * *"

Another witness of plaintiffs testified the fatal car was "about a block" away when he saw the boy between the two tracks. This

witness' testimony might make out a bad case for defendant, and would certainly make out a bad one for plaintiffs, as it would show the boy to have had ample time to stop, look, and listen, and therefore to have been guilty of contributory negligence.

The motorman testified:

"Q. Did you see the little boy who was hurt in the accident before the accident happened?

"A. Just an instant before.

"Q. Where was your car when you saw him?

"A. I was just about even with the upbound Coliseum car. The front end of my car was just about even with the rear end of that car.

"Q. Using the street crossings at Gaiennie street as a guide, tell me where the boy was when you first saw him?

"A. He was nearly in the middle of Gaiennie street.

"Q. Your car was crossing Gaiennie street and you saw him about nearing the middle of Gaiennie street, you saw the boy there?

"A. Yes.

"Q. Where was the little boy with reference to your car, how far away was he from your car?

"A. When I first saw him he was about the middle of the upbound track, right behind the other car.

"Q. How was he with reference to your car, on a line with the front end, or some distance in front of your car?

"A. Just about on a line, or possibly a little bit back from the front end, when I first saw him.

"Q. Which way was he going, straight across Camp street, or diagonally toward your car?

"A. He was coming straight toward my car.

"Q. And the instant you saw him, what did you do?

"A. I applied my brake and attempted to stop.

"Q. Did you see the boy, what happened to him, as your car was passing the boy?

"A. No, sir, I could not say what happened to him it seemed that the little boy was falling, but it was kind of dusk, you know, and I could not tell that he was falling.

"Q. The last glimpse that you got of him, as your car passed him, he was in that position?

"A. I saw him falling, I really thought he was slipping under feet foremost. It was all done in an instant. I could see him falling and knew he was hurt.

"Q. Did your car hit him—I mean the fender and vestibule?

"A. No, sir, the fender was past, or even with the little boy when I first saw him running from behind the other car.

"Q. And he was then, you say, where with reference to the other track?

"A. Right about in the center of the upbound track right behind the other car that he jumped off of.

"Q. After you saw the boy coming toward your car, could you have stopped your car before he reached your car?

"A. No, sir.

"Q. Could you have stopped your car any quicker than you did stop it?

"A. I don't think I could; no, sir.

"Q. What sort of effort did you make to stop your car, for an ordinary service stop, or an emergency stop?

"A. I just jammed the brake right up.

"Q. Did you set them up quickly or slowly?

"A. I set them up as quick as I could.

A passenger on the fatal car testified:

"Q. Did you see the boy concerned in the accident before the accident occurred?

"A. I saw him running across the track just before he hit the car.

"Q. Where was the car then, at the time you saw the boy running across the track?

"A. At the intersection of Gaiennie and Camp streets.

"Q. On which track was he?

"A. On the uptown track.

"Q. Just describe the movement of the boy and the car from the point where you saw him?

"A. I was looking toward the window as the car crossed Gaiennie street and I saw the boy shoot right across the track, and, as he got about the center of the track, his hands went up, and he came down head first into the car.

"Q. About what portion of the car, as near as you can recall, did the boy's head seem to come to?

"A. Just about even with the window ahead of me.

"Q. Do you recall whether the car going uptown passed your car at or about Gaiennie street?

"A. Yes.

"Q. As near as you can tell me, where did that car cross Gaiennie street?

"A. That car, when I saw it, was past Gaiennie street, just past the street, that is, when I saw it, the body of the car had passed me; it was just about into Gaiennie.

"Q. Did you notice, or was your attention directed to anything that the motorman was doing toward stopping his car about that time?

"A. No, I did not see him stop the car. As the car jolted at the corner some old man got up behind me and growled about the way the car was jolting. He sat opposite me, but I did not pay any attention to the motorman—how he stopped the car.

"Q. When you saw the boy crossing the up-bound track, and going toward the track on which you were, which way was he headed, diagonally toward the car in which you were, or straight across the track?

"A. Straight across the track.

"Q. And you say, as he reached near the track, he threw up his hands and stumbled?

"A. He evidently saw the car and tried to stop, or evidently stumbled, or slipped and went head first into the car.

"Q. How far was the front end of the car in which you were from where he was crossing the track at the time you saw him?

"A. I saw him just as he went down, come head foremost into the window at the seat ahead of me, that is about 8 or 9 feet from the front end of the car, behind the fender, anyhow.

"Q. Was he running or walking?

"A. Running."

The conductor of the uptown car testified:

"Q. Where did the little boy who was on your car get off the car?

"A. He hopped off just before the car came to the corner of Gaiennie street, the front end of the car was about the lower side of Gaiennie street, when he hopped off.

"Q. Which way did he go?

"A. He ran across towards the river, right back of the car.

"Q. Did you see him when he ran back of the car?

"A. I did not see him when he got off, he just handed me a paper and told me he was going home, that he was through for the day, and I stepped forward a little to the side, and stuck the paper in the rail, when I saw another Coliseum car coming down, about the upper side of the street, and I turned around, knowing he was going to get off there, because he was in the habit of getting off—I understood he lived out somewhere back there, and just as I noticed the headlight of the car coming across, I turned around to stop him, but I was too late, he had slid off in the back and ran behind the car.

"Q. Did you see him when he was struck by the car, or ran into the car?

"A. I saw him run into the car, but I did not see—I believe he ran into the front of the car, I judged it would be the front end step of the car, he would have been slightly back, right by the front of it, and when I looked back, I imagined he was going into it."

The testimony of the boy witness, as given on the second trial, varies in so many particulars from that given on the first trial and, indeed, as given on the second trial varies so frequently with itself, that we are inclined to believe the conductor of the up-town car when he says that this boy had gotten off at Poeyfarre street.

There were some bruises on the body of the dead boy; but death was caused by a wound in the head:

"His skull was broken and punched in like you would take a triangular shaped bit of bone from one part of the skull. * * * I would say it was probably a 2-inch wound, or maybe 1½ inches one way, and 2 inches the other, it was a triangular piece of bone."

The only part of the car that showed any evidence of having come in contact with the boy was a bolt that went through the cover of the journal box of the left front wheel, on which there were blood, hair and skin. This box was 9 feet 10½ inches from the front end of the car.

There is a good deal of discrepancy in the testimony of the numerous witnesses as to minor particulars—distances; exactly where the two cars stopped; how and where the wounded boy lay; etc. We attach little importance to all this. In the consequent excitement and in the more or less delusive light, the witnesses were as likely as not to derive more or less incorrect impressions on all these points. Some of the contradictions, however, are not to be explained. The boy witness says that it was the fender of the car that struck the boy, and that it struck him on the head, and that he fell forward. The soldier says that the step of the car struck the leg of the boy and that he fell backward. Both of these witnesses were, according to their testimony, within a few feet of the boy and were looking at him when he came in contact with the car. The testimony

on defendant's side is, to say the least, as reliable and weighty as that on plaintiff's side; and it certainly is more consonant with the probabilities. For while such a thing is possible as that a motorman should not see a person in full view ahead on the track of his car, or should not begin to stop his car as soon as he becomes aware of a situation of danger like this, the thing is improbable; whereas, a passenger who has alighted from a car on a double track street, if in a hurry to cross the street, is likely to think it safer to pass back of the car from which he has alighted than to pass in front of it, oblivious temporarily of the fact that he thereby exposes himself to danger from a car coming upon the other track and curtained from his sight by the car he has alighted from. And, again, it is more probable that a newsboy will expose himself in that manner than by staying any considerable length of time within danger upon a car track in full view of an approaching car.

The fact that two juries failed to agree in a case of this kind appealing so strongly to the feelings, and against a corporation at that, and the fact that the learned trial judge decided against plaintiffs, after having twice heard the testimony and paid so close attention to it throughout, as appears from his lucid recapitulations of parts of it now and then in the course of the trial, and also from his questions, would cause the scale to preponderate against plaintiffs, if the testimony left matters balanced; but we do not think it does. We think that, upon the testimony as a whole, plaintiffs have failed to establish by a preponderance of evidence the facts upon which the theory of their case is founded, namely, that the boy remained for a considerable time within the line of danger oblivious of his position, and that the car had a clear chance of avoiding the accident.

Judgment affirmed.

Rehearing refused by Division B, composed of Justices O'NIELL, LAND, and BAKER.